137 F.2d 969 (1943)
QUEENSBORO FARMS PRODUCTS, Inc.,
v.
WICKARD.
No. 319.
Circuit Court of Appeals, Second Circuit.
July 19, 1943.
As Revised August 13, 1943.
*970 *971 *972 *973 *974 Harry Polikoff, of New York City, for appellant.
John S. L. Yost and W. Carroll Hunter, Sp. Assts. to Atty. Gen., Margaret H. Brass, Sp. Atty., Department of Justice, David P. Gordon and Rufe Edwards, Attys., Department of Agriculture, all of Washington, D. C., Tom C. Clark, Asst. Atty. Gen., and Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y., for appellee.
Before L. HAND, CLARK, and FRANK, Circuit Judges.
FRANK, Circuit Judge.
We approach this case having in mind the following important background facts:
The Act was originally enacted in 1933 and was amended in 1935 and again in 1937, 7 U.S.C.A. § 601 et seq. Its original provisions relating to milk were the result of nation-wide distress of milk farmers, a distress which had culminated in a milk farmers' "strike"  accompanied by violence and constituting an incipient agrarian revolution  that threatened to cut off a vital part of the nation's food supply. Experience before and since the passage of that legislation has disclosed that the "milk problem" is exquisitely complicated. The city-dweller or poet who regards the cow as a symbol of bucolic serenity is indeed naive. From the udders of that placid animal flows a bland liquid indispensable to human health but often provoking as much human strife and nastiness as strong alcoholic beverages. The milking of animals in order to make use of their lactic secretions for human food was one of the greatest human inventions,[3] but the domestication of milk has not been accompanied by a successful domestication of some of the meaner human impulses in all those engaged in the milk industry. The difficulties described as "the milk problem" revolve in some considerable measure about the complex relations between the farmers and the "handlers" who buy the milk from the farmers and sell it, in fluid or altered form, directly or indirectly through others, to the ultimate consumers. The resultant intricacies of milk-marketing have frequently led farmers and consumers  sometimes justifiably and sometimes not  to believe that they have been dealt with unfairly.[4] The difficulties have given rise to much legislation and are reflected in many judicial decisions.[5] The pressure of milk *975 is indeed powerful. A milk flood washed away the foundations of what seemed the firmly entrenched constitutional doctrine that the legislature could regulate only business "affected with a public interest"[6]; and the lactic tides have eroded another constitutional doctrine which more recently appeared to have been strongly established (i. e., that only within very narrow limits can Congress delegate "legislative" powers), showing that what oil and chickens could not do milk could.[7] The milk problem is so vast that fully to comprehend it would require an almost universal knowledge ranging from geology, biology, chemistry and medicine to the niceties of the legislative, judicial and administrative processes of government. It affects an industry immense in scope, for dairying is said to be the largest single branch of agriculture in this country with the exception of that of raising livestock for slaughter, the annual money value of dairy products running to billions of dollars.
Appellant makes two principal contentions: first, that the orders, if properly construed, do not justify the Secretary's decision as to appellant; second, that, if construed so as to justify the decision, the orders themselves are invalid because not authorized by the Act. We shall, for convenience, consider those questions in inverse order.
1. In passing on the issue of the invalidity of the orders, we shall assume, for the time being, that the Secretary's interpretation of them, as applied to appellant, is correct. Briefly stated, that interpretation is as follows: A handler, receiving milk from producers at his receiving plant, processes the milk into cream and then ships that cream to a second plant, owned by the same handler, whence it is reshipped, unchanged in form, to buyers at whose plants the cream is processed into ice-cream which is then shipped to their customers; in each such case the milk is, under the orders, classified as cream in determining the price to be paid by the handler who received it from the producers.
Appellant contends that, thus interpreted, the orders are invalid because they employ a classification which is based on "movement" and not on "use" as required by § 8c(5) (A) of the Act. Appellant insists that that section requires a classification under which milk leaving any plant of a handler is classified according to its form when marketed for ultimate consumption.
The legislative history demonstrates that Congress, in employing the words "use" and "use classification" in that section, did not mean "ultimate use." That section and related sections were added to the Agricultural Adjustment Act of 1933 by amendments enacted in 1935. As the bill which eventuated in the amendatory Act of 1935 passed the House, it provided for the classification of milk in accordance with its ultimate utilization. As it passed the Senate, it provided for classification "in accordance with the form in which or the purpose for which it is used * * *" A conference resulted. The conferees on behalf of the House said in their report to the House: "Under the House bill orders relating to milk and its products were to include, among other provisions, provisions for classifying milk in accordance with the form in which it is ultimately used or consumed. The comparable provision in the Senate amendment provides for classification in accordance with the form in which, or the purpose for which, the milk is used. The House recedes."[8]
Whose use, then, did Congress have in mind in providing for "use classification"? Section 8c(1) makes it clear that Congress meant primarily the "handler's use," for that section provides that the Secretary's orders are "applicable to handlers" and to no one else; and they alone are to be regulated under the Act. Certainly nothing is expressly said in the Act as to *976 "the use made by buyers from the handlers." It is noteworthy that the last sentence of § 8c(5) (A) speaks of "the locations at which delivery of such milk, or any use classification thereof, is made to such handlers."[8a]
That same section, however, provides for two alternative kinds of "use classification": milk may lawfully be classified by the Secretary "in accordance with" either (1) "the form in which" the milk is used or (2) "the purpose for which" it is used. The provision is disjunctive. It follows that there may be a valid classification solely in accordance with the "form in which" the milk is used and without regard to "the purpose" of the use. And since it is clear that the use is primarily that of the handlers, it also follows that the Secretary may, in his discretion, classify solely according to "the form in which" the milk is used by a handler without regard to the intended use by (i. e., the purpose of) a purchaser from that handler or by any subsequent purchaser. For we take "purpose" to mean that the handler's use may, in the sole discretion of the Secretary, be determined by reference to the use made by the handler's purchaser or by some subsequent purchaser.
As above noted, it is argued that "form" means solely the "form in which the milk is to be marketed for ultimate consumption" and not any intermediate form; but such an interpretation would obliterate the differentiation between "form" and "purpose," and would thus result in rubbing out of the statute the words, "form in which * * * it is used." Unless there are compelling reasons so requiring  such as, for instance, that of avoiding grave doubts as to constitutionality  courts should not use erasers on legislation, but should try to give a meaning to all the terms of a statute.[8b] We cannot say that the differentiation here is unconstitutional; the legislature, especially when dealing with a complicated subject matter, may make (or authorize to be made) rough-and-ready classifications.[8c] Consequently, this Act is not invalid because it permits a classification which has the result that a handler who makes his own ice-cream can pay the farmer less for his milk than an ice-cream manufacturer who buys his milk or cream from a handler who has bought the milk from the farmer.
The statutory differentiation between "form" and "purpose" justifies, then, the following conclusion: The Secretary, in his order, can lawfully say that, when a handler processes milk into cream, and delivers it to a purchaser in the form of cream, the handler is "using" (or making a "utilization" of) the milk as cream, regardless of the use which his purchaser or any subsequent purchaser may make of it. In other words, Congress gave the Secretary this power at least: to establish a conclusive "use classification" on the sole basis of the form of the milk at the time when the handler moves it from his plant for delivery to his customer.
The following legislative history confirms that interpretation: After the *977 Act was amended in 1935, the Secretary issued several regional milk orders. In some of them, he adopted as a measure of "use," and as a basis for classification, the form in which milk was sold by, or moved from, the plants of, handlers. While those orders were in effect, Congress (because of the decision in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914, holding certain aspects of the Act unconstitutional) after reconsidering inter alia, the provisions which had been added in 1935 and pursuant to which these orders had been made, reenacted those 1935 provisions with amendments not here pertinent.[8d] It is true, of course, that bald re-enactment of statutory provisions, without more, need not be given much weight as indicating an adoption of preceding administrative interpretation;[9] but where careful consideration has  as in the case of the statute before us  been given by Congress in connection with a re-enactment, much is to be said for a contention that Congress intended to adopt the intervening administrative interpretation.[10]
The background and legislative history of this legislation leave no doubt that Congress gave the Secretary broad discretion in its administration. See United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. In particular, he had unlimited discretion as to which of the two statutory methods of "use classification" he should employ. Although given discretion to do so he was not required to make any classification whatever on the basis of the "purpose for which" the milk is used, i.e., its use by someone other than the handler.
He did make a "second plant" exception, based in part on such "purpose." Appellant contends that (for several reasons which we shall note later) this exception is invalid. But, aside from that contention, appellant argues that, reading the order as if there were no such exception, the order (as originally issued and as amended) is void, even if a classification based on the form in which the handler moves the milk for delivery to his buyers would be valid, for this reason: The order is so wide that it covers, says appellant, a broader classification not justified by the statute, based (a) upon the form in which the milk is "held" at the handler's plant or (b) upon the form in which it is "moved," whether it is or is not moved for delivery to the handler's customers. But we do not reach the question whether or not those broader aspects of the provisions are valid, for they do not affect appellant. None of its cream is "held" at its plant or classified on that basis. None of its cream is "moved" other than for delivery to its customers, and none is classified on the basis of any other movements. The greater includes the lesser. So that the classification based on movement includes that classification which alone affects appellant and which is valid i.e., the one based on the form in which the milk is moved by a handler from his plant for delivery to his customers.
It follows that those broader aspects of the order need not here be considered. For, so far as appellant is concerned, the issue of their validity is hypothetical. "Vicarious complaints will not serve."[10a] A person cannot ordinarily raise a question as to the validity of aspects of official action which do not adversely affect his own legally protected interests.[11] That doctrine is well settled "notwithstanding the seeming logic of the position" *978 that, if the official action is invalid as against any persons affected by it, "it is void as to all";[12] accordingly the Supreme Court, having held a statute unconstitutional as applied to one person on a certain state of facts,[13] has subsequently held the same statute constitutional as applied to another person on another state of facts.[13a] That doctrine is but one phase of the Supreme Court's long-established policy of unwillingness to worry about how to cross bridges it has not yet reached.[13b] That reluctance has been manifested in its refusal to consider hypothetical questions relating not only to the constitutionality of statutes[13c] but also to variety of other issues[13d] including  notably for our present purposes  the issue of whether an administrative officer has acted in violation of a valid statute.[13e] Consequently, the possible injury to others than appellant which might result from the Secretary's order is a matter we shall not consider.
The judicial review provisions of this Act  § 8c(15) and 8a(6)[14]  are not like *979 those which were before the courts in Scripps-Howard Radio v. Federal C. C., 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229, and related cases cited in a note,[15] so that those cases are not in point, i.e., Congress did not accord to persons seeking a review under this Act the right to vindicate the public interest, did not constitute them "private Attorney Generals."[16]
Omitting consideration of the exception, the issue as to the validity of the order boils down, then, to this: Can the Secretary lawfully base a classification on the form of the milk when it is moved by a handler for delivery to his customer without regard to its form when subsequently marketed for ultimate consumption? For reasons previously stated, we hold that he can.
We turn now to the exception. This exception provided that if milk, no matter what its form when it leaves a handler's receiving plant, is moved to a "second plant," and is thence moved in a form that is in a class to which a lower price is attached by the order's classification, then it may be classified in accordance with that latter form.[16a] It is conceded that the language of the exception is such that the "second plant" may be that of the handler or someone else.[16b] If the "second plant" is that of the handler's customer, the exception is, at least in part, based on the use by the customer, i.e., on the "purpose for which" the milk is used.
Appellant seems to contend that, as construed by the Secretary, this exception is unauthorized by the Act and that, therefore, the entire order is void. We cannot agree. For, if appellant's contention as to the exception were sound, the maximum result would be that the exception would be void. But the classification, minus the exception, as it applies to appellant i.e., the form in which the product is delivered by the handler to the handler's customers  would then still stand; the Secretary's decision against appellant thus would still be valid, even assuming the exception to be wholly void. In other words, attacks on the validity of the exception can be of no avail to appellant and, therefore, need not here be considered. We can, then, ignore the exception as irrelevant. Cf. City Bank Farmers Trust Co. v. Hoey, 2 Cir., 125 F.2d 577, 579.
Accordingly, we need not consider any of the following suggestions all of which bear solely on the validity of the exception: (a) If appellant transferred the milk cans from the reefer trucks in a vacant lot, and not at its Long Island City *980 plant, then the "second plant" would, in each instance, be that of one of its ice-cream customers, and appellant would have the benefit of the exception; to differentiate between such a shift at a plant from one in a vacant lot, is, it is suggested, unlawfully discriminatory. (b) If appellant had shipped cream from its receiving plant to its ice-cream customers, it would have been entitled, under the exception, to an ice-cream classification; to deprive it of this advantage, because it first shipped the cream to its Long Island City plant, results, appellant suggests, in an unlawful discrimination; for, according to appellant, it is a financial and physical impossibility to make city deliveries by huge reefer-trucks or to make long-haul deliveries to city customers by small delivery trucks, so that the transfer from reefer to delivery trucks is the only way that such deliveries of cream can be made by appellant to its city ice-cream customers; whereas large ice-cream manufacturers, whose plants can be constructed to receive reefers and reefer quantities, can obtain the advantage of lower ice-cream prices of cream, since cream can be delivered to them directly from a handler's receiving plants, with the result that the large ice-cream manufacturers can procure the benefit of the "second plant" exception. (c) Suppose, appellant also suggests, that a handler, who, unlike appellant, owns three plants, processes milk, received from farmers at his first plant, into cream that he ships to his second plant whence, without a change in its form, he ships it to his third plant where it is processed into ice-cream which he then ships to his customers; the "second plant" exception, appellant suggests, would unfairly affect such a handler. But of such alleged unfairness to such a hypothetical handler appellant cannot complain.
For reasons above stated, it is unnecessary here to consider the validity of the "second plant" exception. It is well, nevertheless, to add the following: Since the Secretary was not required by the Act to create any such exception, he had a wide discretion as to the manner in which he contrived it. As the trial judge pointed out, the reason for restricting the exception to a second plant was that experience had shown that "the system of classification gave rise to attempts on the part of some handlers to manipulate the distribution of milk and cream so as to be able to claim its use in products to which a lower price attached, whereas in fact the products were actually in classes to which much higher prices were applicable."[17] The Secretary cannot, of course, deviate from the requirements of the statute merely to avoid difficulties of administration or to facilitate enforcement of the Act;[18] but when, as a matter of grace, he exercises his discretion in granting an exception he may properly take that factor into account. Considering the complexities of administration of such an Act, and the plain intention of Congress to give the Secretary wide discretion in devising regional milk plans (and the classifications incident thereto), the courts must be slow to intrude on his exercise of that discretion, if for no other reason than that, being inadequately staffed, they are incompetent to undertake the task of constructing and supervising milk marketing programs. The Supreme Court has admonished us that interpretations of a statute by officers who, under the statute, act in administering it as specialists advised by experts[18a] must be accorded considerable weight by the courts.[18b] If ever there was a place for that doctrine, it is, as to milk, in connection with the administration of this Act because of its background and legislative history. The Supreme Court has, at least inferentially, so recognized. See United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446,[19] where, too, the court stressed the wide scope of the Secretary's *981 validly delegated discretion under this very statute.
Appellant seems to suggest that its practice of transshipping at its Long Island City plant was in accordance with a "trade custom" and that the Secretary cannot lawfully interfere with such a custom. We do not agree. Congress conferred wide powers on the Secretary precisely in order that he could remake customs of handlers so far as necessary to carry out the "declared policy" of Congress.
2. The question remains whether the Secretary correctly interpreted his orders in deciding that appellant's Long Island City plant is a "second plant." Article III, § 1 of the order of September 1, 1938, provides that all milk received by a handler shall be classified in accordance with its "utilization" at the plant where it is received from producers except that, if it is moved to a "second plant," its classification may be in accordance with its "utilization" at that "second plant." Appellant argues that there is no "utilization" at its Long Island City plant, since all that there takes place is, at most, a transfer of the cream from large to smaller trucks; that consequently the Long Island City plant is not a "second plant" within the meaning of the exception; that, accordingly, in each instance, "the second plant" is a plant of one of its customers who there converts the cream into ice-cream and thence ships it for sale or there sells it to its own customers in that form; and that, therefore, appellant is entitled to an ice-cream classification. We cannot hold that the Secretary was in error in rejecting that argument. "Utilization," as we saw, may properly mean the form in which the handler  here the appellant  ships the milk to his customers. Appellant says in its brief that its activities at its second plant were "a necessary incident of delivery"; they were therefore a necessary part of the "use", if use is defined as the "form in which" the milk is delivered by the handler to its customers. The milk here was shipped from appellant's Long Island City plant to its customers in the form of cream. It was not, then, improper for the Secretary to hold that appellant's "utilization" of the milk at that plant, its "second plant," was as cream.
Appellant's contention as to the amended order of May 1, 1940, is somewhat different. Section 927.3 of that order provides that, if milk leaves a plant in the form of cream, it shall be classified as such, but that, if it is moved to a "second plant," its classification may be in the "form in which it is * * * moved from the second plant," provided that if "received" at that second plant as cream, it "leaves" that plant "in the form of frozen desserts, homogenized mixtures, or cream-cheese." The Secretary decided that here the milk moved as cream to a second plant, the Long Island City plant, where it was received in that form and from which it left in that form. Appellant contends that the cream was not "received at" and did not "leave" the Long Island City plant, because the shifting of the cans at or near that plant did not constitute "receiving"; that the "second plant" at which, in each instance, the cream was "received" was that of a purchasing ice-cream manufacturer, who sold the milk in that form; and that therefore appellant is entitled to an ice-cream classification. The Secretary decided that the Long Island City plant was a "second plant"; that the cream was there received and was "moved from" that plant, even as to those transfers from the large to the smaller trucks which were made in the street adjacent to the building. We cannot say that the Secretary erred in his decision that the operations in the adjacent street were operations at the "plant."[20] So considering the plant, we cannot say that the Secretary was wrong in deciding that the cream was "received" and "moved from" that plant, and that it was a "second plant."
Appellant asserts that the Secretary erred in failing to find that the evidence at the hearing before him showed that, for many months, the Market Administrator *982 acquiesced in appellant's interpretation of the orders. But even if the uncontradicted evidence so showed, that fact would be irrelevant; nothing in the Act or in the orders confers on the Market Administrator, the Secretary's subordinate, the power to bind the Secretary by his own unauthorized interpretations.[21]
Affirmed.
L. HAND, Circuit Judge (dissenting).
I feel the same compunction as my brothers against trenching upon the Secretary's powers; but I also feel, as they do too, that we cannot escape the responsibility of determining whether he has gone beyond the limits set by Congress; and I shall not labor the argument that that is a duty as imperative as the first. The important question is the meaning in § 8c (5) (A) of the phrase: "Classifying milk in accordance with the form in which or the purpose for which it is used," for on that the validity of the orders depends. If I understand it aright, my brothers do not commit themselves to the position that if a "handler" changes milk into cream, ships it to another plant of his own, there makes it into ice cream, and sells it as such, the Secretary may classify it as cream. They go no further than to hold that, even though a mere movement between plants is not a "use," at least a sale is; and that since the plaintiff sold all its milk to ice cream makers in the "form" of cream, it could be classified as cream. The proviso in the first order and the exception in the second they support on the theory that, although the milk may be classified according to the "form" in which it is "used," it need not be; it may also be classified according to the "purpose" for which it is "used"; and in granting to "handlers" the privileges set out in the proviso and exception, the Secretary was availing himself of this alternative standard. But he was not on that account compelled to make that privilege depend altogether upon "purpose"; he might refuse to make "purpose" the sole standard, even in those cases in which he chose to adopt it at all. In other words he might circumscribe a privilege which must rest upon "purpose" to be valid to any extent, by limiting it in certain circumstances by "form." This he did by making "form" count when the movement of the milk to a buyer who was an ice cream maker, was interrupted so as to become two movements. I doubt whether I should in any event be willing to take such a pause as the plaintiff's cream experienced in the case at bar as having any relation whatever to the declared policy of this act, to which it seems to me the merest irrelevancy; but, since I think that the orders inescapably make the "form" in which the milk moves the standard, and not that in which it is sold; and since I further think this is not an admissible standard, I shall not consider the exception or the proviso.
We cannot substitute the "form" in which the milk is sold for the standard set up in the orders, first because the words of the orders have clearly nothing whatever to do with sales. Indeed, not only does the second order make the standard the "form" in which the milk is moved; but even that in which it is "held at" the original plant. Nothing could be further from the notion that the "form" in which it is sold has anything to do with classification. Moreover, such a standard would not work out the policy of the act, for it would operate with the utmost caprice. It would mean that a "handler," who made his own ice cream for example, could pay the producer less for his milk than an ice cream maker must pay who had to buy of "handlers." It seems to me not extreme to say that that is an impossible intent to impute to Congress, both from the view of the producers', and the ice cream makers, interest. Nor can I agree that we can recast the orders to this pattern because the case at bar happens to fit into it, or say, if the Secretary might have made the "form" at sale the standard, though he did not, we will decide the case as though he had. I admit that at times courts have avoided constitutional questions by that device, and it may be tenable when one can say that the statute would certainly have been passed in a constitutional form if the legislature had known that, as it stood, it would be unconstitutional. *983 But I submit that we cannot apply the doctrine to orders like these, and surely not in this instance, for we cannot say that the Secretary would have adopted as a standard the "form" of the milk at its sale. I do not therefore see how we can escape deciding whether the "form" in which milk is moved from, or "held at" a "handler's" plant can be deemed the "form" in which it is "used." Certainly such a movement or holding is not a "purpose" for which it is "used."
Were we not concerned with an administrative ruling I doubt if anyone would for a moment entertain such an interpretation. Congress was certainly thinking in the terms of the industry which regulated the price of milk according to the care in its handling, which in turn depended upon the "form" in which it was to be marketed for consumption, or consumed as a raw material. I cannot imagine that if a standard so remote from either had been intended, its expression would have been left to a word so inept as "use" to express inter plant movements or pauses at a given plant, particularly when that word was exactly fitted to express the "form" in which it was marketed for consumption, or lost its identity as a raw material. Nor does it seem to me to advance the argument a little that the phrase was originally "ultimate use," and was changed lest the actual use made by the consumer might be thought relevant.
It may well be, as my brothers say, that the industry is extravagantly difficult to regulate; if so, I agree that we should accord great latitude in its administration. Had the orders imposed the severest burden upon "handlers" to prove that the "form" in which they moved milk, or even "held" it, was not the "form" in which it was "used," I should have readily assented. Such devices are a necessary part of the paraphernalia of all administrators; and are ordinarily adequate. Perhaps they are not in this case; but if not, they do not justify a departure from the standard set by the statute. Under the guise of effecting its policy we ought not to disregard those means to which the realization of that policy was confided. If the statute, even though fully accoutred from the armory of procedure is still insufficient, the industry must once more resort to Congress.
NOTES
[3] Cf. Haldane, Daedalus (1924) 46-49.
[4] At least one poet has somewhat cynically contemplated one phase of the consumer's interest in the milk problem, saying, "Things are seldom what they seem; Skim milk masquerades as cream." Gilbert, H. M. S. Pinafore, Act II.
[5] See, e.g., Nebbia v. New York, 291 U. S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Hegeman Farms, Corp. v. Baldwin, 293 U. S. 163, 55 S.Ct. 7, 79 L. Ed. 259; Borden's Farm Products Co. v. Ten Eyck, 297 U.S. 251, 56 S.Ct. 453, 80 L.Ed. 669; Baldwin v. G. A. F. Seelig, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032, 101 A.L.R. 55; Mayflower Farms v. Ten Eyck, 297 U.S. 266, 56 S.Ct. 457, 80 L.Ed. 675; Milk Control Board v. Eisenberg Farm Products, 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752; United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 8 L. Ed. 1446; H. P. Hood & Sons v. United States, 307 U.S. 588, 59 S.Ct. 1019, 83 L. Ed. 1478.
[6] Compare Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469, with Ribnick v. McBride, 277 U.S. 350, 48 S.Ct. 545, 72 L.Ed. 913, 56 A.L.R. 1327.
[7] Compare United States v. Rock Royal Co-op., 307 U.S. 533, 59 S.Ct. 993, 83 L. Ed. 1446, with Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L. Ed. 446, and Schechter Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L. Ed. 1570, 97 A.L.R. 947.
[8] The legislative history is discussed in M. H. Renken Dairy Company, 1 Agricultural Decisions 6 (1940).
[8a] Italics added.
[8b] See, e.g., Ex parte Public Nat. Bank, 278 U.S. 101, 104, 49 S.Ct. 43, 73 L.Ed. 202.
[8c] See, e.g., Orient Ins. Co. v. Daggs, 172 U.S. 557, 562, 19 S.Ct. 281, 43 L.Ed. 552; Metropolis Theatre Co. v. Chicago, 228 U.S. 61, 69, 70, 33 S.Ct. 441, 57 L.Ed. 730; Magoun v. Illinois Trust & Savings Bank, 170 U.S. 283, 296, 18 S.Ct. 594, 42 L.Ed. 1037; Carmichael v. Southern Coal & Coke Co., 301 U.S. 495, 509, 510, 57 S.Ct. 868, 81 L.Ed. 1245, 109 A.L.R. 1327; Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 79, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Rast v. Van Deman & Lewis, 240 U.S. 342, 357, 36 S.Ct. 370, 60 L.Ed. 679, L.R.A.1917A, 421, Ann.Cas.1917B, 455; Dominion Hotel v. Arizona, 249 U.S. 265, 268, 39 S.Ct. 273, 63 L.Ed. 597; Louisville Gas Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 72 L. Ed. 770; Louisville & N. R. Co. v. Barber Asphalt Co., 197 U.S. 430, 434, 25 S.Ct. 466, 49 L.Ed. 819; Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 428, 56 S.Ct. 513, 80 L.Ed. 772; cf. United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234; Federal Security Com'r v. Quaker Oats Co., March 1, 1943, 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. ___.

That rule has been frequently applied to cases involving state legislation although, because of the 14th Amendment, the obligation to make reasonable classifications is more rigorous than in the case of the federal government. Quong Wing v. Kirkendall, 223 U.S. 59, 62, 32 S.Ct. 192. 56 L.Ed. 350. It has been especially applied in the field of taxation because of the complexity of the problem; Madden v. Kentucky, 309 U.S. 83, 87, 88, 60 S.Ct. 406, 84 L.Ed. 590, 125 A.L.R. 1383. The complexity of the problem here is fully as great.
[8d] As to those milk orders, see M. H. Renken Dairy Co. v. Wickard, D.C.1942, 45 F.Supp. 332.
[9] Cf. Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 117, 59 S.Ct. 423, 83 L.Ed. 536; Federal C. C. v. Columbia Broadcasting System, 311 U.S. 132, 137, 61 S.Ct. 152, 85 L.Ed. 87.
[10] Cf. Morgan v. Commissioner, 309 U.S. 79, 81, 626, 60 S.Ct. 424, 84 L.Ed. 585; Helvering v. Wilshire Oil Co., 308 U.S. 90, 99, 60 S.Ct. 18, 84 L.Ed. 101; Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263; Feller, Addendum to the Regulations Problem, 54 Harv.Law Rev., 1311, 1321-22 (1941); Griswold, Postscriptum, ibid. 1323-1324.
[10a] Kuhner v. Irving Trust Co., 2 Cir., 85 F.2d 35, 38, affirmed Kuehner v. Irving Trust Co., 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 340.
[11] See, e.g., Heald v. District of Columbia, 259 U.S. 114, 123, 42 S.Ct. 434, 66 L.Ed. 852; Ætna Ins. Co. v. Hyde, 275 U.S. 440, 446, 447, 48 S.Ct. 174, 72 L. Ed. 357; Stockholders v. Sterling, 300 U. S. 175, 184, 57 S.Ct. 386, 81 L.Ed. 586; In re 620 Church St. Bldg. Corp., 299 U. S. 24, 27, 57 S.Ct. 88, 81 L.Ed. 16; Premier Pabst Sales Co. v. Grosscup, 298 U. S. 226, 227, 56 S.Ct. 754, 80 L.Ed. 1155; Ashwander v. T. V. A., 297 U.S. 288, 347, 348, 56 S.Ct. 466, 80 L.Ed. 688; Gorieb v. Fox, 274 U.S. 603, 606, 47 S.Ct. 675, 71 L.Ed. 1228, 53 A.L.R. 1210; Board of Trade v. Olsen, 262 U.S. 1, 42, 43 S.Ct. 470, 67 L.Ed. 839; United States v. Royal Rock Co-operative, Inc., 307 U.S. 533, 556, 59 S.Ct. 993, 83 L.Ed. 1446; Kuhner v. Irving Trust Co., supra; Smolowe v. Delendo Corporation, 2 Cir., June 8, 1943, 136 F.2d 231; Wilgard Realty Co., Inc., v. Commissioner, 2 Cir., 127 F.2d 515, 517; see, also, cases cited in Associated Industries v. Ickes, 2 Cir., 134 F.2d 694, 700, 701.
[12] People of State of New York ex rel. Hatch v. Reardon, 204 U.S. 152, 160, 27 S.Ct. 188, 190, 51 L.Ed. 415, 9 Ann.Cas. 736.
[13] St. Louis I. M. & S. R. Co. v. Wynne, 224 U.S. 354, 32 S.Ct. 493, 56 L.Ed. 799, 42 L.R.A.,N.S., 102.
[13a] Kansas City Southern R. Co. v. Anderson, 233 U.S. 325, 329, 330, 34 S.Ct. 599, 58 L.Ed. 983; cf. 40 Yale L.J. 1110 (1939).
[13b] See, e.g., Clark v. Kansas City, 176 U.S. 114, 118, 20 S.Ct. 284, 44 L.Ed. 392, and Adams v. Milwaukee, 228 U.S. 572, 585, 33 S.Ct. 610, 57 L.Ed. 971, where the Court made clear the relation of the doctrine we are discussing to that general policy.
[13c] See cases cited in notes 11, 12, 13, 13a, 13b. See, also, Austin v. Aldermen, 7 Wall. 694, 699, 19 L.Ed. 224; Adams Express Co. v. Ohio State Auditor, 166 U.S. 185, 222, 17 S.Ct. 604, 41 L.Ed. 965; Gast Realty & Inv. Co. v. Schneider Granite Co., 240 U.S. 55, 60, 36 S.Ct. 254, 60 L.Ed. 523; Lloyd v. Dollison, 194 U.S. 445, 450, 24 S.Ct. 703, 48 L.Ed. 1062; Anniston Mfg. Co. v. Davis, 301 U.S. 337, 355, 57 S.Ct. 816, 81 L.Ed. 1143; Great A. & P. Tea Co. v. Grosjean, 301 U.S. 412, 419, 57 S.Ct. 772, 81 L.Ed. 1193, 112 A. L.R. 293; Electric Bond & Share Co. v. S. E. C., 303 U.S. 419, 443, 58 S.Ct. 678, 82 L.Ed. 936, 115 A.L.R. 105.
[13d] See, e.g., Mills v. Green, 159 U.S. 651, 653, 657, 16 S.Ct. 132, 40 L.Ed. 293; Kimball v. Kimball, 174 U.S. 158, 161, 162, 19 S.Ct. 639, 43 L.Ed. 932; People of State of California v. San Pablo, etc., R. R., 149 U.S. 308, 314, 13 S.Ct. 876, 37 L.Ed. 747; New Orleans, M. & T. R. Co. v. Ellerman, 105 U.S. 166, 173, 174, 26 L.Ed. 1015; Cf. Cover v. Schwartz, 2 Cir., 133 F.2d 541, 546, and cases there cited; Altvater v. Freeman, May 24, 1943, 63 S. Ct. 1115, 87 L.Ed. ; Ætna Life Ins. Co. v. Haworth, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, 108 A.L.R. 1000.
[13e] Perkins v. Lukens Steel Co., 310 U. S. 113, 60 S.Ct. 869, 84 L.Ed. 1108; Alabama Power Co. v. Ickes, 302 U.S. 464, 475, 58 S.Ct. 300, 82 L.Ed. 374, and Duke Power Co. v. Greenwood County, 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381 (where it was asserted not only that the statute was invalid but that, if valid, the acts of the officer pursuant to it were in violation of the statute); Sprunt & Son v. United States, 281 U.S. 249, 50 S.Ct. 315, 74 L. Ed. 832; Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 148, 44 S.Ct. 72, 68 L.Ed. 216. See, also, Stark v. Wickard, App.D.C., June 14, 1943, 136 F.2d 786, 3 Pike & Fischer, Administrative Law, 51 c. 1-18, and cases cited and discussed in Associated Industries v. Ickes, 2 Cir., 134 F.2d 694, 700, 702. Cf. Morgenthau, Implied Regulation in Administrative Law, 23 Iowa L.Rev. (1943) 575.
[14] Those sections read as follows:

"8c(15) (A) Any handler subject to an order may file a written petition with the Secretary of Agriculture, stating that any such order or any provisions of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the Secretary of Agriculture, with the approval of the President. After such hearing, the Secretary shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.
"(B) The District Courts of the United States (including the Supreme Court of the District of Columbia) in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within twenty days from the date of the entry of such ruling. Service of process in such proceedings may be had upon the Secretary by delivering to him a copy of the bill of complaint. If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the Secretary with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires. The pendency of proceedings instituted pursuant to this subsection (15) shall not impede, hinder, or delay the United States or the Secretary of Agriculture from obtaining relief pursuant to section 8a(6) of this title. Any proceedings brought pursuant to section 8a(6) of this title (except where brought by way of counterclaim in proceedings instituted pursuant to this subsection (15) shall abate whenever a final decree has been rendered in proceedings between the same parties, and covering the same subject matter, instituted pursuant to this subsection (15)."
"8a(6). The several district courts of the United States are hereby vested with jurisdiction specifically to enforce, and to prevent and restrain any person from violating any order, regulation, or agreement, heretofore or hereafter made or issued pursuant to this title, in any proceeding now pending or hereafter brought in said courts."
[15] Federal C. C. v. Sanders Radio Station, 309 U.S. 470, 642, 60 S.Ct. 693, 84 L.Ed. 869, 1037; Federal C. C. v. National Broadcasting Co., May 17, 1943, 63 S.Ct. 1035, 87 L.Ed. ___; Associated Industries v. Ickes, supra.
[16] Stark v. Wickard, supra; Associated Industries v. Ickes, 2 Cir., 134 F.2d 694, 704.
[16a] In the amended order, the exception is made applicable only if the product leaving the second plant consists of "frozen desserts, homogenized mixtures, or cream cheese."
[16b] One provision of the amended order, not pertinent here, refers to movement from a "third plant."
[17] Queensboro Farm Products Co. v. Wickard, D.C., 47 F.Supp. 206, 208.
[18] Cf. Lynch v. Tilden Produce Co., 265 U.S. 315, 44 S.Ct. 488, 68 L.Ed. 1034.
[18a] Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 220.
[18b] Gray v. Powell, 314 U.S. 402, 411-413, 62 S.Ct. 326, 86 L.Ed. 301; United States v. Trucking Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Alton R. Co. v. United States, 315 U.S. 15, 22, 23, 62 S.Ct. 432, 86 L.Ed. 586; American T. & T. Co. v. United States, 299 U.S. 232, 236, 241, 57 S.Ct. 170, 81 L.Ed. 142; Federal Security Com'r v. Quaker Oats Co., 318 U.S. 218, 63 S.Ct. 589, 87 L.Ed. ___; Perkins v. Endicott Johnson Corp., supra, 128 F.2d at pages 220-223; Associated Industries v. Ickes, 2 Cir., 134 F.2d 694, 710; Morgan Stanley & Co. v. S. E. C., 2 Cir., 126 F.2d 325, 332.
[19] As to judicial reluctance to interfere with administrative officers in administering a statute relating to complex matters entrusted to their regulation by Congress, see Gray v. Powell, 314 U.S. 402, 411, 412, 62 S.Ct. 326, 86 L.Ed. 301; United States v. American Trucking Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345; Alton R. Co. v. United States, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586; American T. & T. Co. v. United States, 299 U.S. 232, 236, 241, 57 S.Ct. 170, 81 L.Ed. 142; Federal Security Com'r v. Quaker Oats Co., supra.
[20] Cf. Martin v. Matson Navigation Co., D.C., 244 F. 976.
[21] The Secretary is empowered by § 8c(7) (C) (i, ii): (1) to administer "such order in accordance with its terms and provisions," and (2) to confer on the Market Administrator the power "to make rules and regulations to effectuate the terms and provisions of such order." Such powers, if conferred on the Market Administrator would not include authority to make interpretations of the order in particular instances, relating to particular handlers such as would bind the Secretary.