Willard P. FOSTER, J. Riker Robinson, Everett Dence, Paul Doran, Howard Makela, Morris Fluker and Murray Grodman, Plaintiffs,

v.

Orville L. FREEMAN, Secretary of Agriculture, and Anson J. Pollard, Market Administrator, Defendants,

Dairymen's League Cooperative Association, Inc., Northeast Dairy Cooperative Federation, Inc., and Inter-State-Milk Producers' Cooperative, Intervenors.

No. 65 Civ. 1207.

United States District Court
S. D. New York.

June 26, 1967.

**34**

Harry Polikoff, New York City, for plaintiffs.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, New York City, for defendants; Alan G. Blumberg, Asst. U. S. Atty., J. C. Krause, Acting Asst. Gen. Counsel, Department of Agriculture, John C. Chernauskas, Atty., Department of Agriculture, of counsel.

A. Evans Kephart, Philadelphia, Pa., for intervening-plaintiff, Inter-State Milk Producers' Cooperative.

Bond, Schoeneck & King, Syracuse, N. Y., for intervening-defendants, Dairymen's League Cooperative Ass'n, Inc. and Northeast Dairy Cooperative Federation, Inc.

## OPINION

FRANKEL, District Judge.

Before the Agricultural Marketing Agreement Act of 1937 (as amended, 7 U.S.C. § 601 et seq.), the economic conflict between milk producers allied in cooperatives and those outside such associations erupted from time to time "in bitter warfare and bloodshed on the nation's highways." Brannan v. Stark, 342 U.S. 451, 470, 72 S.Ct. 433, 443, 96 L.Ed. 497 (1952) (Black, J., dissenting). The war has gone on since 1937 in the courts, with the assaults on the cooperatives commonly financed by milk handlers who are themselves without standing to assail the payments to cooperatives on which much controversy has centered. Id. at 469, 72 S.Ct. 433; and see United States v. Rock Royal Co-op., 307 U.S. 533, 571–572, 59 S.Ct. 993, 83 L.Ed. 1446 (1939). This case is another battle in that war.

The plaintiffs, who have made similar efforts in other forms and other forums before this, sue to enjoin payments to cooperative associations[1] under Milk Marketing Order No. 2, 7 C.F.R. § 1002 et seq., which governs the New York-New Jersey milk marketing area. Briefly but sufficiently stated, their thesis is that the payments under the governing provisions of the 1937 Act may not exceed the cost to the cooperatives of marketwide services, beneficial to cooperative members and non-members alike; that this limitation is an inescapable corollary of the statutory purpose to assure uniform minimum prices to milk producers; that the payments actually made to the cooperatives, now and for some years, have been substantially greater than the cost of marketwide services performed by them; and that the Order, as it is thus administered, must therefore be held invalid. Asserting that the voluminous papers demonstrate their factual premises without dispute, plaintiffs have moved for summary judgment. In addition, pending the hearing of that motion, they seek a preliminary injunction requiring payment of the disputed sums into escrow until the case is finally decided. Defendants, in what amounts to a cross-motion for summary judgment, seek dismissal of the complaint.[2] For reasons

---

1. The recipients of the payments are two cooperatives and one federation of cooperatives. The difference is of no importance for the problems before the court. It is sufficient here to refer to the three generally as "cooperative associations" or "cooperatives."

2. Two cooperative associations receiving payments under the Order have been permitted to intervene and participate as defendants. A third association has intervened as a plaintiff.

outlined below, all three motions will be denied.

## I.

The Marketing Order in issue has been adequately described elsewhere, e. g., Grant v. Benson, 97 U.S.App.D.C. 191, 229 F.2d 765, 767–769 (1955), cert. denied, 350 U.S. 1015, 76 S.Ct. 658, 100 L.Ed. 875 (1956); Queensboro Farms Products v. Wickard, 137 F.2d 969, 972–973 (2d Cir. 1943). It was characterized in the latter case (p. 974) as dealing with a problem that is "exquisitely complicated." However, the aspects of present concern may be sketched in a few words:

(1) The Order specifies classes of milk, based upon varying uses, and minimum prices for each class.

(2) It provides for payment by milk handlers into a producer-settlement fund administered by the Market Administrator.

(3) By means of an "equalization formula," it operates to give each producer the same average or "blended" price for his milk, regardless of the use for which he sold it.

(4) It provides for deductions of stated amounts from the producer-settlement fund for payment to cooperatives which are required to perform prescribed types of "marketwide services" determined to benefit all producers in various ways, including the maintenance of a stable and orderly market.

The provision for such payments to cooperatives was sustained a dozen years ago in Grant v. Benson, supra, against attack by a group of non-member producers like the present plaintiffs.[3] After some initial ambiguities, the plaintiffs here have conceded that Grant v. Benson should be followed, making it unnecessary to rule whether that class suit is conclusive for this one on grounds of *res judicata*. Cf. Gart v. Cole, 166 F.Supp.

129 (S.D.N.Y.1958), aff'd, 263 F.2d 244 (2d Cir.), cert. denied, 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959). Accepting what Grant v. Benson held, plaintiffs urge that it not only leaves open, but actually supports, their argument against payments to cooperatives exceeding their costs of providing marketwide services. It is appropriate, then, to start here by recalling what was settled for us by the Court of Appeals for the District of Columbia Circuit.

The Court in Grant v. Benson reviewed and sustained the Secretary's findings that the 50,000 producers then governed by the Marketing Order were unable individually to protect their interests in a complex market under a complex scheme of government regulation; that cooperative associations could and did supply the technical personnel and other resources needed for effective representation of such producer interests; that these activities and other "marketwide services" supplied by cooperatives "advance the interests of producers generally throughout the milkshed"; and that without the questioned payments, the cost of such services would have to be borne solely by cooperative members, "engendering an unfair disparity between members and nonmembers." 229 F.2d at 768. Furthermore, the Court noted (p. 769):

"The cooperatives incur expenses in the performance of marketwide services at least equal to the amounts received as payments from the equalization or producer-settlement fund. Approximately 70 per cent of the producers are members of cooperative associations, and the value of the marketwide services is worth more to each producer than the small sum paid to the cooperatives."

Having sustained the Secretary's findings, the Court rejected the contention that the payments to cooperatives were outside the authority given by the statute. In reaching this conclusion, it stressed again the value of the services

---

**3.** The Order had a different number in 1955 and was dissimilar in some other respects, immaterial here.

to all producers and—the point upon which plaintiffs here place their reliance —the relationship between the cost of the services and the payments. It said (p. 770):

"Uniformity in the price received by producers is not destroyed by such payments. On the contrary, the findings are that the services for which they are made are of a marketwide character, and are of greater value to each producer than the small amount paid by him as his contribution to the cost. Further, it is found that the cooperatives incur expenses in the performance of these marketwide services at least equal to the amount received from the fund. If the payments were for services beneficial only to members of the associations the case would be different. But they are for the benefit of nonmembers as well, and they are shown by massive evidence which we cannot ignore, followed by findings which we have no authority, rightfully exercised, to overturn, to be reasonably necessary to accomplish the purposes of the statute through the method adopted."

Stressing the quoted observations in Grant v. Benson, the plaintiffs began some time ago to complain to the Secretary that the cooperatives were receiving unlawfully excessive payments—and, what amounts to the same thing, that the requirement of uniform minimum prices was being breached—because the marketwide services were costing the cooperatives substantially less than the amounts they were receiving from the equalization pool. To consider this and a variety of other questions that had arisen since the last of many amendments to the Order,[4] the Secretary determined in April 1965 that a public hearing should be held to consider the need for additional amendments. The hearing—actually a joint Federal-State proceeding with the States of New York and New Jersey, which have concurrent

provisions duplicating Order No. 2 for application to intrastate marketing— went forward on July 19–23 and August 3–27, 1965. The record thus produced comprises 4,506 pages of transcript and 177 exhibits.

Some sixteen months later, on January 19, 1967, the Deputy Administrator for Regulatory Programs issued a Recommended Decision, which occupies some 15 of the Federal Register's brutal three-column pages. 32 Fed.Reg. 807–822. Reviewing the extensive testimony from partisans and relatively disinterested academicians, he concluded that the payments to cooperatives continued to serve vital objectives under the statute. He reviewed in this connection the highly complex character of the marketing problem; the inability of the lone producer to acquire the technical knowledge or give the time necessary for defense of his interests; the indispensability of experts skilled in law and economics as well as the technology of dairy farming; and the key role performed by cooperatives in supplying representation for the concerns of non-members as well as members. He noted other marketwide services of importance—for example, in providing information and education, in legislative efforts, and in consultations with the Market Administrator. He recommended that the preservation of such benefits required and justified continuation of the payments to cooperatives.

The Deputy Administrator also proposed, however, that the amount of the payments be reduced and the mode of computing them revised. Observing that the cost of marketwide services cannot be isolated precisely from the totality of cooperative functions, he said that the identification must be made with maximum possible accuracy "to insure uniform prices to handlers and uniformity of returns to producers * * *." 32 Fed.Reg. at 811, col. 1. He recommended elimination of the existing provision for increased payments based upon increased

---

4. It appears that from 1953 to the hearing of immediate interest here, there was a total of 21 hearings, 12 suspension actions, and three proposals for termination of the Order.

membership, reasoning that "total expenditures by cooperatives on activities which are of true benefit to all producers should not significantly change with changes in the proportions of member and nonmember producers." Id., p. 812, col. 3. He proposed a flat maximum limit of $108,000 per month upon the payments, reflecting his estimate of "the maximum expenditures * * * during recent years for the various categories of marketing services determined * * * to be reimbursable by cooperative payments." Id., p. 813, col. 1. He proposed revisions in payment procedures, reporting, and public disclosures. Id., p. 815, col. 1. And he recommended deletion of the provision for a "fourth cent" payment to cooperatives operating specified types of "pool plant" facilities. Id., pp. 815–817. The Deputy's Decision concluded with a form of recommended new Order incorporating the foregoing changes and many other provisions unnecessary to summarize here.

Following customary procedure, provision was made for the filing of exceptions to the Recommended Decision, the last day being set originally at February 18, later extended to March 15, 1967. There were numerous and detailed responses to this invitation.

The record, the Recommended Decision, and the exceptions were reviewed by the Secretary. Consultations were held with officials of New York and New Jersey who, as noted above, are intimately concerned because of their concurrent state orders. Acting on views strongly urged by the two interested States, the Secretary concluded that the evidence was not sufficient for determining the appropriate level of cooperative payments. In a Partial Decision dated April 20, 1967, he ordered the hearing reopened (p. 4) "to receive further evidence on the basis for determining the amount of the payments to be made, the particular services appropriately performed for such payments, and the manner in which such payments should accrue to cooperatives and federations." In a variety of other respects which need not be detailed here, the Secretary adopted or modified the Recommended Decision. Agreeing with the basic conclusion that cooperative payments should continue, he observed (p. 8):

"Payments to qualified cooperatives for the performance of marketwide services have long been utilized in this order as the means for encouraging the development and maintenance of producer representation in the regulatory process and at the same time correcting any inequities in this regard to producers who are cooperative members. This is consistent with stated Federal public policy to encourage cooperatives, and in fact continues to be necessary."

In accordance with the Secretary's Partial Decision, the reopened hearing was held during sixteen days in the period from May 9 to June 9, 1967. Some 2,500 pages of additional testimony and 131 new exhibits were received. Briefs were ordered to be filed by July 15, 1967, so that the proceeding remains to be completed as this is written.

At this point, it becomes necessary to go back in time to trace the course plaintiffs have followed in seeking to end or reduce the allegedly unlawful payments. In July, 1964, in what appears to have been a kind of attempted "end run," they filed two companion suits in the Northern District of New York against various cooperative associations, asserting that the defendants were receiving moneys under Order No. 2 exceeding their costs of marketwide services, and were diverting such "trust funds" to "private" uses. Foster v. Mutual Federation of Independent Cooperatives, Inc., Civ. No. 10191; Foster v. Metropolitan Cooperative Milk Producers Bargaining Agency, Civ. No. 10205. They sought declaratory relief, an accounting, and return of the alleged excess to the producer-settlement fund. No federal or other official was named, but when the defendants moved to dismiss, application was made and granted for the United States and the Secretary of Agriculture to appear as *amici curiae*. The

motion to dismiss was granted on December 11, 1964. No appeal was taken.

In dismissing those complaints, Chief Judge Brennan found it unnecessary to determine whether the Secretary of Agriculture was an indispensable party. He held:

(1) That the amount of the payments received by the cooperatives under Order No. 2 "for marketwide services does not rest entirely upon the cost thereof to the [cooperatives] but is fixed principally upon the element or benefit of value to all producers affected." Referring to the Secretary's 1953 findings, he found clear indications "[t]hat it is the value of the services rather than the cost thereof, which is the basis for the rate fixed and the payments made * * *."

(2) That plaintiffs were wrong in contending that the payments to the cooperatives should be deemed "trust funds." He found no support for the theory in either the statute or general equity principles. "Equity would hardly require that the defendants must repay any excess of expenditure over cost but may not recover any deficiency."

Having reached those conclusions, he found it unnecessary to rule upon the further defense that the matter was within the primary jurisdiction of the regulatory agency.

Rallying swiftly after their defeat in the Northern District, plaintiffs filed their present complaint on April 21, 1965. It was this, they say, which caused the Secretary to issue, on April 28, 1965, the notice leading to the July-August hearing mentioned above. In the court's view, it is not important to decide whether that is so. What seems more important, as will be noted again below, is that plaintiffs, for whatever reasons they thought sufficient, have delayed for some two years in bringing on for decision their asserted need for extraordinary relief by way of preliminary injunction.

## II.

■ The shortest—and, perhaps, the sufficient—answer to plaintiffs' motion for summary judgment is that the "facts" they invoke are not by any means undisputed. Assuming for the moment that plaintiffs are correct when they contend that payments to cooperatives may not exceed the cost of marketwide services, the asserted excess has not been demonstrated. To be sure, the Deputy Administrator, upon a huge but incomplete record which is not here, thought there was an excess. He noted, however, that the matter is not susceptible of ready or confident or simple calculation. The Secretary, reviewing the record, found it insufficient. Intervening cooperatives here submit sworn and documented assertions that the cost of the services is actually greater than the payments. And an expert scholar upon whose study plaintiffs put great reliance has acknowledged that "the determination of whether or not a given individual expenditure was of a market-wide nature is highly subjective and in many cases one man's opinion is as good as another."

The finding of a subtle, complex, and unresolved factual problem is sufficient to defeat plaintiffs' motion for summary judgment. Defendants' counter-application for dismissal calls for some further discussion.

■ For their part, the plaintiffs have tended to confuse the problem by treating the Secretary's function as if it were one of simple adjudication. Ignoring the fact that amendments to marketing orders under the statute are permitted only after hearings and favorable votes by producers (see 7 U.S.C. § 608c), they have argued that the entire procedure may be by-passed because the Secretary has taken a long time to reach a conclusion following the 1965 hearings. They cite cases like Deering Milliken, Inc. v. Johnston, 295 F.2d 856 (4th Cir. 1961), involving the rarely asserted power of courts to limit undue protraction of relatively simple adjudicatory proceedings. In this sort of inapposite argumentation, they overlook that the

subject here is a delegated role of administrative "legislation" in a field of bewildering complexity, bitterly divergent partisan interest, and inevitably large discretion confided to the expertise over which a cabinet officer presides and on which he must rest his judgments. Insofar as it is suggested that the Court should govern the Secretary's pace or take over his functions, the plaintiffs have misconceived their problem. This is a field in which complaints that the Secretary has been too slow or inadequate must go to the Congress, from which his delegation comes.

On the other hand, the defendants may be excessively enthusiastic in the opposite direction when they argue that plaintiffs must be dismissed because (1) Grant v. Benson upheld Order No. 2 so that (2) plaintiffs have no course but to await an amended Order and attack it on the administrative record. Reluctantly accepting Grant v. Benson, plaintiffs argue, with some plausibility, that the result of that case was hinged to the Secretary's finding that costs of marketwide services to the cooperatives were "at least equal" to the payments they received. What they urge, in effect, is that though it was once valid, the Order has been rendered unlawful by changed circumstances. Cf. United States v. Carolene Products Co., 304 U.S. 144, 153–154, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

The Government contends, on the other hand, that this cannot be deemed an open question because the Order as sustained in Grant v. Benson did not and does not *in its own express terms* require that the cooperative payments be tied to costs of the marketwide services. But the Government, which must turn corners no less square than those it marks out for others, cannot be heard to insist that the Secretary's *findings,* so much relied upon in Grant v. Benson, were matters of no consequence.

The Government draws a stronger bow when it points out that the Order could never have been read to require a steady, inexorable, and undeviating relationship between costs and payments. The payments were not calculated in terms of costs, but upon such factors as quantity of milk produced and sold, cooperative membership, facilities provided, and other things which could at most have been related indirectly to costs. Indeed, plaintiffs, somewhat inconsistently, invoke this as an argument that they (or their class) could have made, but neglected to, in Grant v. Benson.

■ The Government argues, further, from the decision of Chief Judge Brennan in Foster v. Mutual Federation, supra, that the heart of the matter was not cost of the services to the cooperatives but their value to the producer beneficiaries. With the facts so undeveloped at this time, and with a substantial prospect that the question may never require resolution in this case, there is no need to attempt a simple either–or judgment. Tentatively, however, it would seem that both criteria, cost and value, can fairly be deemed relevant. Assuming this, the very uncertainties defeating plaintiffs' motion weigh against the dismissal defendants seek.

■ The Secretary is under a duty, "whenever he finds that any order [like the one involved here], * * * or any provision thereof, obstructs or does not tend to effectuate the declared policy of [the statute, to] terminate or suspend the operation of such order or such provision thereof." 7 U.S.C. § 608c(16) (A). As nearly as the court can perceive among many irrelevancies, plaintiffs assert that the duty is being breached because cooperative payments are grossly excessive in terms of both the cost and the value of the marketwide services. The result, they contend, is to violate the basic requirement of uniformity in the price received by producers, non-members as well as members of cooperatives.

It may be doubted whether plaintiffs can prove the facts they assert. It seems probable moreover, that an amended Order will become effective before plaintiffs are able to proceed very far in that

direction, thus mooting the question this case seems to pose. But there is no amended Order, and it would appear to be at least premature to order dismissal of the complaint now.[5]

Accordingly, whatever different conclusion may be warranted if and when the Secretary promulgates an amended Order, defendants' application for dismissal of the complaint will be denied at this time.

### III.

 What has been written above should substantially demonstrate that plaintiffs are not entitled to a preliminary injunction. The probability of their ultimate success in this action seems slight. And the equities do not favor them. They waited two years to press for the preliminary relief they now claim is urgent. While it is true that payments continue to be made under what may be a partially invalid or imperfect Order, this is far from sufficient to justify a temporary prohibition or an order requiring that the moneys be put in escrow. The cooperatives receiving the payments have come to rely heavily upon them in the period of over a decade since Grant v. Benson sustained the Order. Producers like the plaintiffs continue to receive the benefit of market-wide services. While the amounts involved sound large in themselves, they are comparatively insignificant fractions (about one-half of one percent) of the producer-settlement fund and comparatively trivial exactions from each of the 40,000 or so producers who are today governed by the Order. In a word, the potential damage to other interests and the public interest represented by the Secretary seems clearly to overweigh the alleged injury plaintiffs seek to have abated by an injunction *pendente lite*.

The motions for summary judgment and for a preliminary injunction are denied.

It is so ordered.

5. The parties have not touched the question whether the Secretary's failure or refusal to terminate or suspend under 7 U.S.C. § 608c(16) (A) is reviewable, and, if so, to what extent. The provision is mandatory as a literal matter; it says the Secretary "shall" terminate or suspend "whenever he finds" the prescribed conditions. Since it is his finding that controls, it would appear that a large measure of discretion is given him on this as on other subjects. It is doubtful, however, whether his exercise of this discretion, or failure to exercise it, is wholly unreviewable. In the absence of a factual record, and without focused submissions from the parties on this subject, it seems appropriate to assume at this stage that plaintiffs could show some state of facts justifying a court's intervention.