**COUNTY LINE CHEESE COMPANY, et al., Plaintiffs-Appellants,**

v.

**Richard E. LYNG, Secretary of Agriculture, et al., Defendants-Appellees.**

No. 86–2357.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 27, 1987.

Decided July 9, 1987.

---

John H. Vetne, Blodgett & Makenchnie, Peterborough, N.H., for plaintiffs-appellants.

Aaron B. Kahn, U.S. Dept. of Agriculture, Office of Gen. Counsel, U.S. Dept. of Agriculture, Washington, D.C., Sydney Berde, Sydney Berde & Associates P.A., St. Paul, Minn., for defendants-appellees.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This case concerns the validity of several administrative regulations governing the sale of milk. A farmer can get a higher price for milk that will be sold for consumption as milk (Class I milk) than for milk that will be used to make yogurt or cheese (Class II and III milk). Thus, some farmers get better prices than others. To end the adverse effects of "ruinous competition" for that premium, Congress decided to permit all farmers to share equally in the premium. The result was the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 et seq. Acting pursuant to his authority under the Act, the Secretary of Agriculture has established regional milk pools, which are used to share among farmers in each pool the premium paid for

Class I milk. Each farmer who chooses to participate in the pool receives a uniform price for his milk from the handler he sells it to, regardless of the use the handler makes of the milk. The handlers who then use milk for Class I uses must pay into the "producer settlement fund" the money they saved by not having to pay for the milk at Class I prices. The handlers who use milk for Class II and III uses receive money from the pool, because they had to pay the uniform price rather than just the Class II or III price. County Line was a handler who bought milk principally for Class III uses and thus regularly received payments from the regional fund.

In order to qualify for the pool under the applicable administrative regulations, County Line's milk had to be "shipped to" Meadow Gold's plant. Because Meadow Gold did not need the milk, County Line would pump the milk into the plant, immediately pump it back out again and take it elsewhere. Finding this a waste of time, County Line employees, over a six-month period, simply parked its trucks at Meadow Gold's plant for a few minutes. The Secretary determined that this did not constitute "shipping" the milk to Meadow Gold, although the pumping in and out routine did. County Line was retroactively disqualified from the pool for six months and had to give back payments it had received from the producer settlement fund in that period. Meadow Gold also incurred liabilities to the pool because of County Line's disqualification. The district court granted summary judgment affirming the Secretary's rulings.

County Line and Meadow Gold contend that the Secretary did not act "in accordance with law" as required by the Act in interpreting the regulations to require that the milk be physically unloaded to be considered "shipped to" the plant. They also contend that favorable treatment given pool milk under the regulations violates the Act by erecting a trade barrier to the use of nonpool milk and by failing to give uniform prices to handlers. We will affirm.

I

Various regional "milk orders" have been promulgated pursuant to the Act of the Secretary, including the Indiana Milk Marketing Order, which governed the parties in this case. This is the order's basic scheme. Producers may choose to participate in the "pool". The Secretary decides upon an appropriate price for each class of milk: Class I ("fluid milk": milk sold as milk), Class II (milk used to make soft products like eggnog and yogurt), and Class III (milk used to make hard products like butter and cheese). The Secretary determines how much "pool" milk in each category was bought by handlers from participating producers and multiplies that by the class price. The results from the three classes are added together; this result is divided by the total number of gallons of pool milk. The final result is the "blend price": that is the minimum price handlers must pay participating producers.

For each handler, it is determined how much he would have had to pay for his milk according to the uses he made of it (use value) and how much he would have had to pay if he bought it all at the blend price (uniform value). For example, a handler who used all the milk he bought as Class I milk would have a higher total use value than uniform value. If the handler's use value is higher than the uniform value, he must pay the difference into the "producer settlement fund"; if the uniform value is higher, then he receives the difference from the fund. The theory is that each handler will pay producers the blend price for milk. If he then uses that milk as Class I milk, he saved money; the savings go into the fund. If he uses the milk as Class III milk, he paid more than he should have had to pay and the fund reimburses him.

County Line and Meadow Gold, two subsidiaries of Beatrice Foods Company, were both handlers. Meadow Gold owned a distributing plant. County Line owned a supply plant and a cheese factory. County Line bought milk from producers and assembled it at the supply plant. Some of that milk it sold to Meadow Gold; most it

sent to the cheese factory. Because the greater part of County Line's use was to make cheese, a Class III use, it was advantageous for County Line to qualify for the pool and thus receive payments. Under the applicable regulation, 7 C.F.R. § 1049.-7(b), County Line's supply plant could qualify each month as a "pool plant" if not less than fifty percent of its milk was "shipped to" a qualified distributing plant. So County Line began to deliver at least fifty percent of its milk to Meadow Gold's distributing plant.

Meadow Gold did not need that much milk. Meadow Gold got most of its milk from a cooperative and used County Line's milk only to make up its residual needs. But to permit County Line to qualify for the pool, the parties arranged for County Line to truck at least fifty percent of its milk to Meadow Gold and pump it into its plant. What Meadow Gold did not need was pumped right back onto County Line's trucks and sent to the cheese factory. The Secretary accepts this as constituting "shipping" the milk to Meadow Gold.

The Market Administrator administers the Indiana Order, which is the body of regulations, promulgated pursuant to the Act, that govern the Indiana milk pool. The Market Administrator audited Meadow Gold in February of 1981. Auditors observed that some County Line trucks, rather than unloading and reloading their milk, simply parked at the plant for a while and then drove off. The auditors examined records of County Line and Meadow Gold, including bills of lading and weight tickets. The auditors first decided how long it would take a truck to drive from County Line's supply plant to Meadow Gold, pump the milk in and out of the plant, and drive to County Line's cheese plant. Any truckload that had made it from the supply plant to the cheese plant in less than that minimum time was not counted toward the fifty percent figure necessary to qualify County Line for the pool each month. With these adjustments in mind, it was determined that County Line failed to meet the fifty percent total for any of the months of September, 1980, through February, 1981. In most of those months, County Line was

determined to have "shipped" about thirty percent of its milk to Meadow Gold. The September figure was 49.50 percent; thus County Line missed qualifying for that month by only one half of a percentage point.

The supply plant was "depooled" for those months. The Market Administrator required County Line to repay $199,221.74 that it had received in payments from the producer settlement fund.

County Line's disqualification from the pool also caused unpleasant sequelae for Meadow Gold. As discussed above, the amount of payments Meadow Gold received from or paid into the pool depends on the uses to which it put its pool milk. The milk Meadow Gold had received from County Line was now nonpool milk. When a handler receives both pool and nonpool milk, the question is how to allocate it between uses. For example, if the handler who receives one-half pool milk and one-half nonpool milk uses one-third of his total milk for each class of use, payments could be based on the assumption that he uses half pool and half nonpool in each class, that he uses all his pool milk for Class I use, or through some other formula.

Under the Indiana order, as under most regional milk orders, pool milk is disproportionately allocated to Class I use. Pool milk is given priority in Class I allocation, unless less than twenty percent of the handler's milk has been allocated to Classes II and III, in which case allocation is made pro rata. This is less advantageous for a handler than a pure pro rata system would be, because it results in his average use of pool milk being closer to Class I than it would be if pro-rated, which in turn increases his net liability to the pool.

Furthermore, for each gallon of nonpool milk that remains allocated to Class I use, the handler must make a "compensatory payment" into the fund of the difference between the blend price and the Class I price. The rationale is that he purchased the nonpool milk at the blend price and thus will receive an unfair advantage in the calculation of payments if that is not cor-

rected. Whether or not he actually paid the blend price for the nonpool milk is not considered.

After Meadow Gold's accounts with the pool were refigured to include the reallocation and the compensatory payments, Meadow Gold had to pay $128,781.70 into the pool.

Meadow Gold and County Line were initially successful before an Administrative Law Judge. The Secretary's Judicial Officer overruled the ALJ, holding that the Market Administrator's interpretation of the term "shipped to" in the regulations was a permissible interpretation of Order language and in accordance with the Act. He concluded also that the repayments and assessments were not unauthorized penalties for noncompliance with a rule as appellants contended but rather simply audit adjustments. He held also that the treatment of nonpool milk neither violated the requirement of uniform prices to handlers nor constituted an impermissible trade barrier to the purchase of nonpool milk.

The district court affirmed the decision and order of the Judicial Officer. Associated Milk Producers, Inc., was permitted to intervene in the action and brief the issues because the members of AMPI, as producers regulated by the Indiana Milk Order, stood to lose directly if the Judicial Officer's order was reversed; requalification of County Line for the months in question would result in the blend price being lowered and thus producers receiving less.

## II

The Secretary contends that the district court lacked subject matter jurisdiction. The Act provides that handlers may seek judicial review of whether the Secretary's ruling on a petition was "in accordance with law":

> The District Courts of the United States in any district in which such handler is an inhabitant, or has his principal place of business, are vested with jurisdiction in equity to review such rulings....

7 U.S.C. § 608c(15)(B). It appears from the facts in the complaint that County Line and Meadow Gold do not inhabit or have their principal places of business in the Northern District of Illinois, where this action was brought.

We interpret the relevant language to relate to venue, rather than jurisdiction. The statute is thus read to mean, "The district courts have jurisdiction and the following are the requirements for venue." Because the Secretary did not raise the issue earlier, objections to venue are waived. To read the provision to vest jurisdiction only in the district court where the handler resides or has his principal place of business would lead to unwieldy litigation where handlers from more than one district jointly bring an action. Although no published opinion considers the question, courts have implicitly answered it in this way in considering actions for review brought by several handlers. *E.g., American Dairy of Evansville, Inc. v. Bergland,* 627 F.2d 1252 (D.C.Cir.1980) (fifty-seven handlers from various districts).

We follow the Supreme Court's interpretation of similar language. For example, the Court interpreted the following language in the Jones Act to relate to venue:

> Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.

*Panama R. Co. v. Johnson,* 264 U.S. 375, 44 S.Ct. 391, 68 L.Ed. 748 (1924). Such a reading conforms with the normal practice of Congress to vest jurisdiction in the district courts and then to use venue provisions to govern where the suit should be brought. *Id.; see also Hoiness v. United States,* 335 U.S. 297, 69 S.Ct. 70, 93 L.Ed. 16 (1948).

## III

In adopting the predecessor to the present milk order, the Secretary made explicit the rationale for requiring that, in order for a supply plant to qualify for the pool, fifty percent of its milk must be "shipped to" a qualified distributing plant:

> Pool plant status should not be determined solely on an occasional shipment of milk to the market ... [P]lants only

casually, or incidentally, associated with the market should not be subject to complete regulation. Neither should they be permitted or required to equalize their sales with all plants in the market. If a milk plant were to be permitted to share on a pro rata basis the Class I utilization of the entire market without being genuinely associated with the market, then the differentials paid by users of Class I milk could be dissipated without accomplishing their intended purpose. If a plant were to be qualified and regulated merely by making a token shipment of milk or cream into the market for sale as Class I milk, then any milk plant which found itself in a position where it was selling a smaller share of its milk in Class I than the average for all regulated handlers might make such shipment and receive equalization payments from the pool.

26 Fed.Reg. 67, 69–70 (1961) (incorporated by reference in adopting the present order). The Market Administrator had, in a 1965 case, interpreted the word "shipped" in the Order Regulating the Handling of Milk in Northeastern Wisconsin to require physical unloading in order to count as part of a forty percent requirement figure for pool plant status. *In re Owen Dairy Co.*, 24 Agric. Dec. 1171, 1174–75 (1965). Other milk orders, such as the Chicago Order, spell out that the milk must be "shipped or transshipped and physically unloaded." Chicago Milk Marketing Order, 7 C.F.R. § 1037.7(b) (1980).

Appellants do not question the general requirement that a supply plant "ship" half its milk to a qualified distributing plant in order to qualify for the pool. They attack the specific requirement of physical unloading on two bases. The first is requiring the milk to be pumped into the plant assumes that milk should only be shipped to the plant if it is needed, whereas the purpose of the Act is to permit producers to share in the Class I premium whether or not their milk is used as Class I milk. The second is that the interpretation of "shipped to" as requiring physical unloading is unreasonable where other orders explicitly require physical unloading and the

Secretary has previously held that cream was "received" by a plant where the cream was only brought in a truck to the street next to the plant.

The Secretary's interpretation does not bar County Line from qualifying, it simply requires that County Line pump its milk into Meadow Gold's plant to do so. The regulation might well be arbitrary if it provided that in order to qualify, County Line must pump its milk into and out of Meadow Gold's plant. But only pumping *in* is required. The fact that the County Line does not then lose qualification by pumping the milk out again is a generous interpretation of the regulation in County Line's favor. Permitting that bootstrapping and holding that the "wasteful" routine must be excused would logically lead to holding that the milk need not be sent in the first place. The Market Administrator was entitled to draw the line at some point as to what would constitute shipping the milk and he drew it at a very reasonable point. The common meaning of the words "shipped to" would seem to require that the shipper intend the milk to reach its natural destination, the tanks of the distributing plant. To put it another way, the fact that the milk needn't stay shipped does not mean that you don't have to ship it in the first place.

This is not a case where the administrative agency has added by interpretation of its regulations a requirement that does not appear in the regulations, unlike *Usery v. Kennecott Copper Corporation*, 577 F.2d 1113 (10th Cir.1977). Rather, the Secretary has interpreted the words "shipped to" in a very logical and reasonable manner.

Appellants also contend that because the requirement of physical unloading is spelled out in other orders, the Indiana Order should be read not to require physical unloading. First, the Secretary had, in a published opinion, interpreted the same language as in the Indiana Order to require physical unloading, thus negating any inference from the more general rule of construction on which appellants rely. Second, the fact that other orders explicitly provide that shipping something requires

delivering it as it is normally delivered hardly justifies the strained reading that appellants seek in the present case.

Nor does *Queensboro Farms Products, Inc. v. Wickard*, 137 F.2d 969 (2d Cir.1943), mandate a different result. There, the court upheld the Secretary's determination that cream was "received" at and "moved from" a plant where the cream was not brought into the plant but was merely shifted from larger to smaller trucks. The words "shipped to", which have been specifically interpreted as noted above, were not at issue in *Queensboro*. The order provisions at issue were entirely different from the ones in this case, with different underlying reasons. The facts are also different: the cream was unloaded in that case, even if it was then loaded on to another truck rather than brought into the building. The lesson from that case most pertinent here is a broader one: "The Supreme Court has admonished us that interpretations of a statute by officers who, under the statute, act in administering it as specialists advised by experts must be accorded considerable weight by the courts." (footnotes omitted) 137 F.2d at 980. Similar weight is due the Secretary's [1] interpretation of the regulations he propagates. *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977).

## IV

■ Appellants view the payments into the pool required of them as a penalty, one which the Market Administrator lacks specific authority to impose under the Act and regulations. This is a mischaracterization of the facts in this case. The Market Administrator had made payments to County Line from the producer settlement fund under 7 C.F.R. § 1049.72. To be eligible for those payments, County Line had to ship not less than fifty percent of its milk each month to Meadow Gold. When the Market Administrator, as a result of the audit, determined, on the basis of facts of

which County Line had been aware, that County Line had been ineligible, he required the return of the money. Similarly, Meadow Gold's accounts were reckoned again in light of County Line's disqualification. The actions were the rectification of mistakenly made payments, a typical outcome of an audit. Appellants were given full opportunity to contest the findings.

Appellants suggest that the proper course would have been for the Secretary to use the enforcement provisions of the Act, which provide for fines to be levied against handlers who violate an order. But the handlers here are not accused of violating the Act or regulations. The errors were the payments by the Secretary and underpayments by Meadow Gold. Supply plants need not join the pool. They may if they wish. Failure to qualify is not wrongdoing. But payments made on the mistaken belief that a plant has qualified should clearly be recoverable by the Secretary, especially as here, where the payments had been made only a few months earlier. Such a power is implicit in a system like the present, where the Market Administrator must make payments sixteen days after the end of each month and is empowered to later audit the records that formed the basis of those payments.

## V

■ Appellants also contend that the Indiana Order's treatment of nonpool milk violates 7 U.S.C. § 608c(5)(G), which provides:

No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States.

The Supreme Court has interpreted this section to prohibit milk order provisions that erect "trade barriers" to the purchase

---

1. "The milk problem is so vast that fully to comprehend it would require an almost universal knowledge ranging from geology, biology, chemistry and medicine to the niceties of the legislative, judicial and administrative processes of government." *Queensboro Farms Products, Inc. v. Wickard*, 137 F.2d 969, 975 (2d Cir.1943) (Frank, J.).

of nonpool milk. *LeHigh Valley Coopera-tive Farmers, Inc. v. United States,* 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962).

In *LeHigh,* the Secretary had faced two problems engendered by the fact that non-pool milk from outside the area was avail-able for purchase. First, handlers who were required to pay for pool milk at mini-mum class prices could be undercut by handlers who purchased nonpool milk at lower prices; this problem was particularly acute in the case of handlers who bought milk at Class I prices, who could be under-cut by handlers who bought nonpool milk at a price higher than the blend price but still below the Class I price. Second, the blend price that producers receive would be lowered if handlers relied principally on nonpool milk for their Class I needs.

The Secretary's answer was a compensa-tory payment system. For each gallon of nonpool milk a handler bought, he was required to pay into the pool the difference between the Class I and Class III prices. The Secretary sought to thus eliminate the competitive advantage held by nonpool milk, an advantage that it had only because of the minimum prices required for pool milk.

The Supreme Court held that this went too far. The purpose of the Act was not to preserve for the producers in the area the premium on Class I milk, it was simply to put producers on even terms. But if a handler paid a nonpool producer any more than the Class III price, the milk would cost the handler more than the Class I price. This was an impermissible barrier to the purchase of nonpool milk, which would lose any competitive advantage it had in all but rare cases.

The Court nullified regulations that im-posed a trade barrier to nonpool milk, but held "The Secretary of course remains free to protect, in any manner consistent with the provisions of the statute, the 'blend price' ... against economic consequences resulting from the introduction of outside milk." 370 U.S. at 99, 82 S.Ct. at 1181. The Court suggested in dictum that a com-pensatory payment of the difference be-tween the blend price and the Class I price,

as in this case, would pass muster. 370 U.S. at 87–88, 82 S.Ct. at 1174–75 n. 13.

The compensatory payments required un-der the Indiana Order do not present a trade barrier. For each gallon of nonpool milk that a handler purchases and allocates to Class I use, he must make a compensato-ry payment of the difference between the Class I and the blend price. That differ-ence is small, much smaller than the pay-ment of the difference between the Class I and Class III prices in *LeHigh.* The Class I and blend prices in the relevant part of Indiana were $13.56 and $13.32 respective-ly per hundredweight in November of 1980, a relatively much smaller difference than the $2.70 payment added to a $6.40 price in *LeHigh.* The payment would put nonpool milk at a disadvantage only in the cases where the nonpool milk's price fell between the blend price and the Class I price, be-cause the handler's total cost after adding the compensatory payment would then be more than the Class I price. Such milk is already costlier than the *average* gallon of pool milk, so the small disadvantage seems only to erase an artificial advantage gained by the way the price supports work. Where the nonpool milk's price was greater than the Class I price, it would already cost more than pool milk.

As the Court in *LeHigh* explained, such a payment accords equivalent treatment to handlers who buy either pool or nonpool milk at more than the blend price. A han-dler is free to pay a pool producer more than the mandatory blend price, but he remains liable to the pool for the difference between the blend and Class I prices. The milk's total cost to him is then greater than the Class I price; this mirrors the effect of the compensatory payment when the han-dler pays more than the blend price for nonpool milk.

The same rationale would apply to the priority given to pool milk in allocating the handler's use of milk. The fact that pool milk is allocated to Class I uses first would not affect the market for Class I uses of milk. There, if the handler buys nonpool milk for his Class I needs at less than the Class I price, he saves. The allocation sys-

tem does, however, make it more efficient for him to buy pool milk for his Class III needs unless the nonpool price is less than the Class III price. The pool producer receives the blend price for that milk. But this difference is attributable not to any payment required for using nonpool milk but to the equalization payment given for the handler's purchase of pool milk, which is an essential component of the system. But for that system, pool milk bought for Class III purposes would presumably sell at the Class III price and thus undersell nonpool milk sold above that price. Again, the allocation system serves only to nullify an artificial advantage.[2]

Appellants contend also that the charges to Meadow Gold violate the Act's requirement that producers receive uniform prices. Under 7 U.S.C. § 608c(5)(A), minimum prices for each use classification "for milk purchased from producers ... shall be uniform as to all handlers." But nonpool milk is not "milk purchased from producers." Participation as a producer under an order is voluntary and the Act clearly differentiates between "producers" and "dairy farmers not delivering milk as producers." *E.g.,* 7 U.S.C. § 608c(5)(B)(ii)(f)(iii). Thus nonpool milk is not subject to the minimum price requirement and the requirement of uniformity. Nor do the regulations at issue here prescribe minimum prices that handlers pay for nonpool milk; if anything, they act to lower the maximum amount that handlers will be willing to pay for nonpool milk. That has already been analyzed under *LeHigh.*

### VI

For the reasons stated, the judgment of the district court affirming the Secretary's ruling is

AFFIRMED.

BAUER, Chief Judge, concurring:

I concur and join in the excellent opinion of Judge Eschbach in all respects. I write

only to suggest that a disinterested observer would have to be forgiven if he found the pumping-in and pumping-out program to be a marvelous example of government nuttiness. Why it is required (bureaucratically) is well spelled out by the opinion; nevertheless, I would hate to have the world believe that the judicial branch of government created the necessity for this weird piece of human behavior.

---

2. We note that granting relief might be inappropriate in this case even if the regulations were facially invalid, where County Line has not offered evidence of the prices that it paid producers and thus has not shown that there was a

trade barrier in effect. *See Lewes Dairy, Inc. v. Freeman,* 401 F.2d 308, 316–17 (3rd Cir.1968), *cert. denied,* 394 U.S. 929, 89 S.Ct. 1187, 22 L.Ed.2d 455 (1969).