FINDINGS OF FACT and CONCLUSIONS OF LAW
 

 D. BROOKS SMITH, District Judge.
 

 I.
 
 Introduction
 

 Several Pennsylvania dairy farmers and a dairy cooperative
 
 [1]
 
 challenge the validity
 
 of
 
 the Secretary of Agriculture’s regulations governing the marketing of fluid milk in the New York-New Jersey milk marketing area.
 
 [2]
 
 Plaintiffs allege that the Secretary’s regulations, promulgated pursuant to the Agricultural Marketing Agreement Act of 1987, 7 U.S.C. § 601
 
 et seq.
 
 (“the Act”), violate 7 U.S.C. § 608e(5)(G), which states:
 

 No marketing agreement or order applicable to milk and its products in any marketing area shall prohibit or in any manner limit, in the case of the products of milk, the marketing in that area of any milk or product thereof produced in any production area in the United States.
 

 I held an evidentiary hearing on January 28, 1993 to determine whether the Secretary’s regulation, as applied to the plaintiffs, constitutes a prohibited economic trade barrier,
 
 see Lehigh Valley Cooperative Farmers, Inc. v. United States,
 
 370 U.S. 76, 91-98, 82 S.Ct. 1168, 1175-80, 8 L.Ed.2d 345 (1962), to milk producers and sellers outside the New York-New Jersey milk marketing area. The parties have filed proposed findings of fact and conclusions of law (Docket Nos. 42 and 44). I now enter the following findings of fact and conclusions of law:
 

 II.
 
 Background
 

 A.
 
 Regulation of Milk Products Under the Federal Order System and Order 2
 

 Raw milk has two principal end uses: fresh fluid milk or for use in manufactured products such as yogurt, butter and cheese. Milk that is sold for fluid use brings a higher price than milk sold for use in manufactured products; accordingly, in the absence of regulation, competition among farmers for fluid milk sales can be intense. During the Great Depression, the demand for fluid milk fell, exacerbating the price-depressing effects of fierce competition and seasonal milk surplus, and causing unrest among milk producers.
 
 See
 
 Richard A. Ippolito and Robert T. Mas-son,
 
 The Social Cost of Government Regulation of Milk, 21 J. Law &
 
 Econ. 33, 36 (1978).
 

 Congress responded by enacting the Agricultural Marketing Agreement Act, which authorizes the Secretary to promulgate milk marketing orders. The milk marketing or
 
 *412
 
 ders divide milk into different classes, depending upon the ultimate use to which the milk will be put, and require all handlers in the marketing area to pay a higher minimum price for milk that will be sold as fluid milk (“Class I milk”) than for milk that will be used in manufactured products such as yogurt and cottage cheese (“Class II milk”), or as butter and cheese (“Class III milk”). Producers, who sell their milk in fluid form, receive the same price for their milk, whether it is sold for fluid consumption or used in manufactured products.
 

 Reconciliation of the uniform price received by producers with the varying prices paid by handlers is accomplished by operation of the producer settlement fund (“the Fund”). Each month, the Market Administrator establishes the minimum price for each class of milk, and then ascertains the total volume of milk, by class, used in the market. By multiplying the volume of each class of milk by the applicable class price, and dividing the product by the aggregate volume of all milk, the Administrator arrives at the uniform “blend price” which handlers must pay to all producers regardless of the ultimate utilization of their milk. 7 C.F.R. § 1002.61. Handlers pay into the Fund the amount by which their purchased milk multiplied by the respective minimum class prices, is greater than their purchased milk multiplied by the blend price. Handlers receive from the Fund the amount that the handlers’ purchased milk multiplied by minimum class prices, is less than their purchased milk multiplied by the blend price.
 
 See United States v. Rock Royal Co-Operative,
 
 307 U.S. 533, 555, 59 S.Ct. 993, 1004, 83 L.Ed. 1446 (1939).
 

 The Secretary regulates milk sales in the New York-New Jersey milk marketing area through marketing Order No. 2 (“Order 2”), 7 C.F.R. § 1002,
 
 et seq.,
 
 issued pursuant to 7 U.S.C. § 608c(l). These consolidated actions focus on certain of the Secretary’s regulations in Order 2 requiring what are commonly known as “partially regulated handlers” located outside the marketing area to make payments to the Order 2 producer settlement fund.
 

 Generally, under Order 2, a handler shall be a fully regulated handler, and its facilities designated a “pool plant,” each month that it classifies at least twenty five percent of its milk as Class I-A for distribution in the New York-New Jersey marketing area. 7 C.F.R. § 1002.28(a). Handlers that classify less than the minimum percentage of their milk as Class I-A for distribution in the marketing area are informally called “partially regulated handlers,” and their facilities are designated “partial pool plants.” 7 C.F.R. § 1002.29. Unlike fully regulated handlers, partially regulated handlers are subject to regulation only on their sales of Class I milk in the marketing area.
 

 Sani-Dairy, the handler to whom the individual plaintiffs sell their milk, is a partially regulated handler under Order 2, and is required to account to the Order 2 Fund in the same manner as fully regulated Order 2 handlers: it must pay the Fund the difference between the Class I minimum price and the blend price of milk on all the milk it sells in the marketing area each month. 7 C.F.R. §§ 1002.50-1002.77. Order 2 permits a partially regulated handler to meet its obligation to the Fund in one of three ways: (1) purchase from fully regulated handlers sufficient quantities of milk to meet its distribution requirements; (2) become fully regulated itself
 
 [3]
 
 ; or (3) establish a “bulk tank unit” pursuant to 7 C.F.R. § 1002.25. Tr. 148. Handlers who are partially regulated under Order 2 by dint of their milk sales in that marketing area, but fully regulated by another federal milk marketing Order, have no obligations whatsoever to the Order 2 producer settlement fund. Tr. 165-66.
 

 B.
 
 Sani-Dairy’s Operation Under Order 2
 

 Sani-Dairy is a Johnstown, Pennsylvania based handler that distributes milk and dairy products in four federal milk order marketing areas.
 
 [4]
 
 Its maximum distribution radius
 
 *413
 
 has increased from fifty miles in 1960 to about two hundred miles today, largely attributable to greater transportation efficiencies. Tr. 33-35. Sani-Dairy has marketed milk products in New York state since 1989, and currently distributes its products in Che-mung, Tioga and Cortland counties only through retail outlets of its own subsidiary companies. Tr. 32. Sani-Dairy purchases its milk from 165 individual dairy farmers, including plaintiffs, and from the MMI cooperative. Tr. 30.
 

 Sani-Dairy meets its obligations to the Order 2 producer settlement fund by pooling some of the milk it purchases on a “bulk tank unit,” which in practice is nothing more than an accounting mechanism. Sani-Dairy “pools” milk on its bulk tank unit by identifying and designating raw milk that it purchases from eleven producers, including the individual plaintiffs, as Class I milk that will be resold in Order 2, and accounting for that milk accordingly. Tr. 59. Pursuant to the Order 2 pricing regulations described above, Sani-Dairy must make “compensatory payments” to the Order 2 producer settlement fund for all milk pooled on its bulk tank unit for Class I resale in the Order 2 marketing area. It is undisputed that for approximately eighteen months, Sani-Dairy has pooled an amount of milk on its bulk tank unit ranging from 250,000 to 500,000 pounds greater than the amount required to satisfy its obligation under Order 2.
 
 [5]
 
 Tr. 152.
 

 Although Sani-Dairy is not fully regulated by any federal marketing Order, it is subject to the regulations of the Pennsylvania Milk Marketing Board (PMMB). Tr. 38. Like Order 2, the PMMB establishes minimum prices that handlers must pay producers for each class of milk. As a result of these PMMB regulations, Sani-Dairy has paid the producers from whom it purchases milk a minimum Class I price averaging $0.49 per hundredweight greater than Order 2’s minimum Class I price since it began selling milk in the Order 2 marketing area.
 
 [6]
 
 Nevertheless, Order 2 levies the same producer settlement fund obligations on Sani-Dairy as it does on fully regulated handlers within the marketing area. Tr. 153-55.
 

 From December 1989 through December 1992, Sand-Dairy's average compensatory payment to the Order 2 Fund for milk it pooled on its bulk tank unit for Class I distribution was $1.77 per hundredweight. Plaintiffs’ Exhibit 5. The total dollar amount paid by Sani-Dairy to the Order 2 Fund during that same period was $563,590.51.
 

 The PMMB permits Sani-Dairy to deduct these compensatory payments from its entire producer payroll. Tr. 73. As a result, the cost of the payments Sani-Dairy makes to the Order 2 Fund is borne by all of its producers, including those not designated as bulk tank unit producers. Tr. 57, 73. The bottom line for each of Sand-Dairy’s producers, then, is that Sani-Dairy pays them fifteen and one quarter cents ($0.1525) per gallon of milk less than it otherwise would, which amount is directly attributable to the Order 2 compensatory payment. Tr. 55.
 

 III. Discussion
 

 The issue in this case is whether the Order 2 regulatory scheme acts to “prohibit” or “limit” the marketing of nonpool milk in the Order 2 marketing area, in violation of 7 U.S.C. § 608c(5)(G). As the
 
 Lehigh Valley
 
 court stated, “the word ‘prohibit’ refers not merely to absolute or quota physical restrictions, but also encompasses economic trade barriers____”
 
 Lehigh Valley,
 
 370 U.S. at 97, 82 S.Ct. at 1180.
 

 Plaintiffs have demonstrated by a preponderance of the evidence that the producer-handler market is competitive and that a
 
 *414
 
 handler’s bid for producers’ milk often turns on one or two cents per gallon: “Sometimes ... in rough situations it can be even less, half a cent.” Tr. 55. Under those conditions, Order 2’s imposition of an additional fifteen cents per gallon charge on such producers would be an economic barrier of the sort contemplated by § 608c(5)(G).
 

 The Order 2 charge applies to all milk pooled on the bulk tank unit, not the amount of milk actually distributed in the Order 2 marketing area. To the extent Sani-Dairy pools excess milk on its bulk tank unit, it pays more money than necessary to the Order 2 Fund. Order 2 requires only that partially regulated handlers pool enough milk on their bulk tank units to cover their monthly average distribution in the marketing area. 7 C.F.R. § 1002.25; Tr. 149-150. Admittedly, identifying that figure precisely is probably impossible, and handlers may prefer to err on the side of over-pooling. But the Secretary demonstrated that Sani-Dairy regularly pools substantially more milk in its bulk tank unit than necessary. Sani-Dairy’s excess, ranging from 25 percent to 50 percent over its monthly average distribution of Class I milk into Order 2, is objectively high. Defendant is not under any duty to inform Sani-Dairy that it is pooling too much milk on its bulk tank unit, and that it could save money for itself and for plaintiff producers by pooling an amount that more closely approximates that amount it actually distributes.
 

 The Secretary calculates the cost of Sam-Dairy’S obligations to Order 2, based upon the amount of milk Sani-Dairy was
 
 obligated
 
 to pool (not the greater amount of milk it actually did pool) at $463,556.79, or $1.48 per hundredweight, Defendant’s Exhibit 1. A charge of $1.48 per hundredweight translates into a per gallon charge of 12.7 cents, compared to 15.5 cents per gallon by SaniDairy’s calculations.
 

 Using either set of figures, the compensatory payment scheme places a regulatory disadvantage on the plaintiff producers that New York producers are not burdened with, and in a market where bids turn on one or two, or even five or ten cents per gallon, Tr. 87-88, it is a disadvantage substantial enough to violate § 608e(5)(G).
 

 The crux of the problem is that Order 2 levies its charge on Sani-Dairy regardless of what Sani-Dairy paid its producers pursuant to PMMB regulations. Under the federal milk marketing scheme,
 
 [7]
 
 Order 2 may properly protect its producers from underpriced milk dumped into the marketing area by outside handlers.
 
 Lehigh Valley,
 
 370 U.S. at 99, 82 S.Ct. at 1180. Even before the Order 2 charge, however, Sani-Dairy already pays plaintiff producers 3.5 percent more per hundredweight than Order 2 handlers pay their producers under the Order 2 blend price. Accordingly, the “compensatory” payment does not level the playing field between partially regulated handlers such as Sani-Dairy and Order 2 handlers; rather, it places SaniDairy at a substantial disadvantage by piling an extra charge on top of the already-higher PMMB minimum blend price Sani-Dairy must pay to its producers.
 

 The Supreme Court found, in
 
 Lehigh Valley,
 
 that a previous incarnation of Order 2 protected the blend price received by Order 2 pool producers from the competitive impact of nonpool milk, as though all such milk were physically excluded and they alone supplied the Order 2 marketing area.
 
 Lehigh Valley,
 
 370 U.S. at 89-90, 82 S.Ct. at 1175. Although not as egregiously as in
 
 Lehigh Valley,
 
 the Secretary has protected Order 2 producers from
 
 all
 
 nonpool milk, not merely from
 
 underpriced
 
 nonpool milk. Order 2 thereby forces “nonpool milk ... to subsidize the pool milk and insulate the pool milk from the competitive impact caused by the entry of outside milk,”
 
 id.
 
 at 91, 82 S.Ct. at 1175. This creates a price protection scheme broader than the Secretary has been authorized to promulgate.
 

 
 *415
 
 In
 
 Lehigh Valley,
 
 the Supreme Court struck down a compensatory payment scheme requiring the plaintiff, a partially regulated handler, to make payments to the Order 2 Fund of equalling 43 percent of the PMMB minimum Class I price the handler already paid to its producers.
 
 Id.
 
 at 86, 82 S.Ct. at 1174. The Court also noted that the Secretary could, and under other milk marketing orders did, consider “the actual price of nonpool milk” when calculating compensatory payments owed by nonpool handlers.
 
 Id.
 
 at 87 n. 13, 82 S.Ct. at 1174 n. 13. The Order 2 Administrator currently does not consider the effect of the PMMB regulations when determining the obligation of partially regulated handlers.
 
 [8]
 

 The Court in
 
 Lehigh Valley
 
 “did not strike down all compensatory payments,”
 
 Lewes Dairy, Inc. v. Freeman,
 
 401 F.2d 308, 314 (3d Cir.1968), but only those charges that “[bear] no relation to the actual cost of the milk,”
 
 id.
 
 at 313, or to the nonpool “handler’s competitive advantage.”
 
 Fairmont Foods Co. v. Hardin,
 
 442 F.2d 762, 771 (D.C.Cir. 1971). Sani-Dairy makes payments of 10-12 percent more than the PMMB minimum Class I price, depending upon whether one accepts plaintiffs’ or defendant’s calculation of the average payment per hundredweight. Given the competitiveness of the market, the effect of the Secretary’s 'regulations is not distinguishable from those struck down in
 
 Lehigh Valley.
 

 Footnote 13 to
 
 Lehigh Valley
 
 does not compel a different conclusion. In that footnote, the Court addressed the Secretary’s concern that nonpool handlers could acquire a competitive advantage by paying their non-pool producers a premium over the Order 2 blend price. After considering alternative regulatory schemes, including the one currently used by the Order 2 Market Administrator, Justice Harlan opined that the Secretary “might be able to justify a compensatory payment equal to the difference between the nonpool milk’s ‘use value’ and the ‘blend price,’ though we do not decide the question.”
 
 Id.
 
 at 87 n. 13, 82 S.Ct. at 1174 n. 13.
 

 The Secretary contends that because SaniDairy “is paying the same as its competitors, and its producers receive no less than any other similarly situated Order 2 producer,” Order 2 as currently administered complies with the regulatory scheme Justice Harlan approved in dictum. However, plaintiff producers are not “similarly situated” with any Order 2 producer, because their competitive environment is dictated by PMMB regulations and prices, which do not mirror Order 2 regulations and prices. Unlike the plaintiff in
 
 Lehigh Valley,
 
 Sani-Dairy cannot be treated
 
 as if
 
 it operated on terms similar to those faced by Order 2 handlers, for SaniDairy does not
 
 choose
 
 to pay its producers more than the Order 2 minimum Class I price for milk purchased. Therefore, the Court’s suggestion in footnote 13 that “the exaction of a Class I-blend price payment would effectively discourage [nonpool handlers’] purchases in excess of the [Order 2] blend price” is inapposite to the instant case. Sani-Dairy obtains no competitive advantage over Order 2 producers by paying plaintiff producers more than the Order 2 minimum Class I price, and cannot be discouraged from paying its producers more than Order 2 minimum prices in any event, for the price it pays for raw milk is determined by PMMB regulations.
 

 The conclusion I reach is supported by
 
 County Line Cheese Co. v. Lyng,
 
 823 F.2d 1127 (7th Cir.1987), the most recent reported case addressing the compensatory payment scheme
 
 sub judice
 
 in light of 7 U.S.C. § 608c(5)(G). In
 
 County Line,
 
 one of the plaintiffs was a handler who purchased milk from another pool handler. When the selling handler’s plant from which the purchasing
 
 *416
 
 handler bought its pool milk was “depooled” for several months, the purchasing handler had to make compensatory payments into the producer settlement fund on each gallon of “nonpool” milk it had purchased during those months. The purchasing handler’s obligation for those months was the same as SaniDairy’s obligation since it began distributing milk in the Order 2 marketing area: the difference between the blend price and the Class I price.
 
 Id.
 
 at 1129-30.
 

 The court in
 
 County Line
 
 rejected the plaintiff handlers’ § 608e(5)(G) challenge to the compensatory payment scheme in light of
 
 Lehigh Valley.
 
 In so doing, the court considered three situations to which the compensatory payment scheme might apply. First, a handler might purchase nonpool milk at a price less than the pool’s blend price. In that case, requiring the handler to pay a compensatory payment of the difference between the Class I and the blend price clearly compensates the pool producers without putting the nonpool milk at a disadvantage, for nonpool Class I milk could still enter the pool at a total cost less than pool Class I milk.
 

 Second, the fact pattern actually faced by the plaintiff in
 
 County Line,
 
 a handler might purchase nonpool milk at a price that falls somewhere between the blend price and the Class I price. In that case, the compensatory payment would put nonpool milk at a slight disadvantage, “because the handler’s total cost after adding the compensatory payment would then be more than the Class I price.” However, it is appropriate to demand the payment from purchasers of non-pool milk for the sake of consistency, because handlers who buy pool milk at more than blend price have to pay the difference between blend and Class I too.
 
 Id.
 
 at 1134;
 
 Lehigh Valley,
 
 370 U.S. at 87 n. 13, 82 S.Ct. at 1174 n. 13.
 

 Finally, it is possible that a handler would purchase nonpool milk at a price that is higher than the Class I price. In that case, the “nonpool milk’s price ... would already cost more than pool milk,”
 
 County Line,
 
 823 F.2d at 1134, and the purchasing handler should not be subject to a compensatory payment. Any compensatory payment is inappropriate under this scenario for two reasons. First, no price advantage can possibly redound to the handler who buys nonpool milk at a price greater than Class I. Second, no purchaser of pool milk would ever be subject to the payment obligation because, assuming economic rationality in the Milk Marketing Order regulatory system of milk pricing, it is inconceivable that the over-blend premium pool producers sometimes enjoy would ever be so high as to raise the price they receive over the minimum Class I price.
 

 In sum, where a nonpool handler already pays its producers 3.5 percent more for raw milk than handlers in the protected marketing area, imposing an extra 10-12 percent charge on the nonpool handler neither wholly nor partially “compensates” entities regulated under the order, that is, does not “put[ ] pool and nonpool milk on substantially similar competitive positions at source,”
 
 Lehigh Valley,
 
 370 U.S. at 84, 82 S.Ct. at 1173. Rather,- in that situation the charge is a sheer penalty,
 
 see Kass v. Brannan,
 
 196 F.2d 791, 795 (2d Cir.1952), that, plaintiffs have shown by adequate evidence,
 
 see United States v. Ott,
 
 214 F.Supp. 616, 618 n. 4 (D.Del.1963), constitutes an economic trade barrier making nonpool milk more expensive, impermissibly limiting the marketing of dairy products in the Order 2 marketing area for the benefit of “those doing business in [that area], at the expense of those outsiders seeking to enter the market,”
 
 Lewes Dairy,
 
 401 F.2d at 315, in violation of 7 U.S.C. § 608c(5)(G).
 

 An appropriate order follows.
 

 ORDER
 

 AND NOW, this 30th day of December, 1993, consistent with the foregoing Findings of Fact and Conclusions of Law, judgment is hereby entered in favor of plaintiffs John P. Strittmatter, d/b/a Strittmatters Dairy, Delbert and Ed Thomas, Lowell Friedlin, Arthur Bloom, James L. Harris, and Milk Marketing, Inc. Defendant’s Motion For Summary Judgment (Docket No. 44) is hereby DENIED.
 

 It is further ORDERED, that defendant’s Motion To Admit Defendant’s Exhibit 1-a (Docket No. 37) and Motion To Strike Por
 
 *417
 
 tions of Plaintiffs’ Exhibit 1 (Docket No. 38) are denied as moot.
 

 In the event that the parties are unable to agree within thirty (30) days of this Order on the appropriate measure of damages due to plaintiffs, they shall apply to the Court for a determination of damages.
 

 [1]
 

 . By Memorandum Order dated October 29, 1991 (Docket No. 22), the Secretary’s motion to dismiss the complaint filed by plaintiff SaniDairy was granted because Sani-Dairy, a milk processor, or "handler” as that term is defined by 7 C.F.R. § 1002.7, failed to exhaust its administrative remedies before seeking judicial review. The claims of the individual plaintiffs, all dairy farmers, or "producers” as that term is defined by 7 C.F.R. § 1002.6, and of Milk Marketing, Inc. ("MMI"), a dairy farmer cooperative, were not dismissed.
 

 [2]
 

 . The marketing area is defined in 7 C.F.R. § 1002.3.
 

 [3]
 

 . A partially regulated handler may only become fully regulated if its Class I utilization is at least as high as that of handlers who are already fully regulated under Order 2. Tr. 178.
 

 [4]
 

 .. In addition to the Order 2 marketing area, Sani-Dairy distributes its products in Order 33 (central Ohio), Order 36 (western Pennsylvania
 
 *413
 
 and eastern Ohio) and Order 4 (southeastern Pennsylvania and northeastern Maryland).
 

 [5]
 

 . Sani-Daity is required to pool an amount of milk on its bulk tank unit equivalent to the amount of fluid milk it regularly distributes in the Order 2 marketing area. Tr. 152.
 

 [6]
 

 .
 
 From December 1989 through December 1992, the PMMB minimum blend price that handlers were required to pay to producers averaged $14.90. During the same period, the Order 2 minimum blend price averaged $14.41. Plaintiffs’ Ex. 4. The difference between the PMMB minimum blend price and the Order 2 minimum blend price may actually be greater than $0.49 because Sani-Dairy’s Johnstown plant is located farther than 200 miles from New York City, a factor which would lower the minimum blend price required by Order 2. Tr. 44-45.
 

 [7]
 

 . Edward Gallagher, Chief of Market Analysis for the Office of Market Administrator in Order 2 testified that “the purpose of ... the Federal Milk Marketing Orders is to assure that handlers competing in a specific area have an equal raw product cost for their class of milk in that area.” Tr. 198. Cf.
 
 Lehigh Valley,
 
 370 U.S. at 84, 82 S.Ct. at 1173 (compensatory payments "put[l pool and nonpool milk on substantially similar competitive positions at source”) (citation omitted).
 

 [8]
 

 . Edward Gallagher testified on direct examination:
 

 [B]ecanse we don’t have any control over how these States set their regulations it is impossible for us to really take them into consideration in setting our regulations. Because after we make a change and if — if we start recognizing these prices and went through the expensive and time-consuming process of having a hearing and changing a marketing order to recognize this the next or soon thereafter the State could end up doing something. — changing their regulations and things would be out of whack again. So it would become a virtual impossibility because the Secretary cannot control what the States are doing.
 

 Tr. 200.